IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| DANA ANN DANO,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>ANDREW SAUL, Commissioner of Social Security,[1]<br><br>　　　　Defendant. | Case No. 18-cv-00434-DKW-RT<br><br>**ORDER REVERSING DECISION OF COMMISSIONER OF SOCIAL SECURITY AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS** |

On November 13, 2018, Plaintiff Dana Ann Dano filed a Complaint for review of the Commissioner of Social Security's denial of her applications for disability insurance benefits and supplemental security income. In her Opening Brief, Dano asks this Court to review (1) whether evidence submitted to the Appeals Council was improperly dismissed, (2) whether the Administrative Law Judge (ALJ) improperly rejected Dr. Judith Timbers' opinions, and (3) whether the ALJ improperly rejected Dano's testimony. After carefully reviewing the record and the arguments of counsel, the Court concludes that this case must be remanded for further administrative proceedings as set forth below. Specifically, it is

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul was automatically substituted as the party-defendant in this action upon his confirmation as the Commissioner of Social Security.

abundantly clear from the ALJ's decision that the ALJ wished to review the treatment records of Dr. Timbers that were provided to the Appeals Council. Clear, at least, to everyone but the Appeals Council. In addition, irrespective of the evidence submitted to the Appeals Council, even taken on its own terms, the ALJ's residual functional capacity (RFC) determination is, at least in part, inconsistent and unsupported by substantial evidence, requiring remand for clarification of the same.

## BACKGROUND

### I. Review of Disability Claims

A five-step process exists for evaluating whether a person is disabled under the Social Security Act (SSA). 20 C.F.R. § 404.1520; 20 C.F.R § 416.920. First, the claimant must demonstrate that she is not currently involved in any substantial, gainful activity. *Id*. §§ 404.1520(a)(4)(i), (b); §§ 416.920(a)(4)(i), (b). Second, the claimant must show a medically severe impairment or combination of impairments that significantly limit her physical or mental ability to do basic work activities. *Id*. §§ 404.1520(a)(4)(ii), (c); §§ 416.920(a)(4)(ii), (c) Third, if the impairment matches or is equivalent to an established listing under the governing

regulations, the claimant is judged conclusively disabled. *Id*.
§§ 404.1520(a)(4)(iii), (d); §§ 416.920(a)(4)(iii), (d).

If the claimant's impairment does not match or is not equivalent to an established listing, the Commissioner makes a finding about the claimant's residual functional capacity to perform work. *Id*. § 404.1520(e); § 416.920(e). The evaluation then proceeds to a fourth step, which requires the claimant to show her impairment, in light of the RFC, prevents her from performing work she performed in the past. *Id*. §§ 404.1520(a)(4)(iv), (e), (f); §§ 416.920(a)(4)(iv), (e), (f). If the claimant is able to perform her previous work, she is not disabled. *Id*. § 404.1520(f); § 416.920(f). If the claimant cannot perform her past work, though, the evaluation proceeds to a fifth step. *Id*. §§ 404.1520(a)(4)(v), (g); §§ 416.920(a)(4)(v), (g). At this final step, the Commissioner must demonstrate that (1) based upon the claimant's RFC, age, education, and work experience, the claimant can perform other work, and (2) such work is available in significant numbers in the national economy. *Id*. § 404.1560(c); § 416.960(c); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (explaining that, at Step Five, the burden moves to the Commissioner). If the Commissioner fails to meet this

burden, the claimant is deemed disabled. 20 C.F.R. § 404.1520(g)(1);

§ 416.920(g)(1).

## II. **The ALJ's Decision**

On December 6, 2017, the ALJ issued a decision finding Dano "not disabled" under the SSA. Administrative Record ("AR") at 114. At Step One of the evaluation process, the ALJ determined that Dano had not engaged in substantial gainful activity since the alleged onset date of December 1, 2012. *Id.* at 105. At Step Two, the ALJ determined that Dano had severe impairments of bipolar disorder and anxiety disorder. *Id*. at 105-107. At Step Three, the ALJ determined that Dano did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the governing regulations. *Id*. at 107-108.

Before reaching Step Four, the ALJ determined that Dano had the residual functional capacity to perform a full range of work at all exertional levels, but with the following non-exertional, mental function limitations:

> she must avoid concentrated exposure to hazardous machinery and unprotected heights; she is limited to simple routine repetitive tasks; she can perform only low-stress work, defined as permitting no more than occasional changes in work setting; she cannot perform production rate pace work (*i.e.*, she cannot perform traditional assembly line work in which another employee's performance depends on her immediate prior performance) but rather goal oriented

4

work; she can occasionally interact with the public[;] and[,] she can frequently interact with co-workers and supervisors….

*Id*. at 108-112.

At Step Four, the ALJ determined that Dano was unable to perform any past relevant work. *Id*. at 112. At Step Five, the ALJ determined that jobs existed in significant numbers in the national economy that Dano could perform. *Id*. at 113-114. More specifically, a vocational expert stated that, in light of Dano's RFC, age, education, and work experience, she would be able to perform the jobs of housekeeping cleaner, routine clerk, and photocopy machine operator. *Id*. at 113. This final determination resulted in the ALJ finding that Dano was not disabled under the SSA at any time from December 1, 2012 through December 6, 2017, the date of the ALJ's decision. *Id*. at 114.

### III. The Appeals Council's Decision

Subsequently, Dano sought review from the Appeals Council. *Id*. at 340. Having obviously read the ALJ's comments lamenting the absence in the record of contemporaneous progress notes from Dano's longtime health care provider, Dano submitted for the Appeals Council's review approximately eighty pages of such notes from Dr. Judith Timbers dated July 26, 2012 through November 29, 2017. *Id*. at 2, 18-93, 486-490. Dano also submitted a letter from Dr. Timbers, dated

5

December 11, 2017, explaining why the progress notes had not been previously provided, and both a letter and a treatment record from Dr. Rodney Yamaki, each dated January 23, 2018. *Id*. at 16, 95-96, 98.

On September 12, 2018, the Appeals Council denied Dano's request for review of the ALJ's decision. *Id*. at 1. With respect to the progress notes from Dr. Timbers, the Appeals Council stated that it "did not consider and exhibit this evidence." *Id*. at 2. At the same time, having decided that this evidence did not warrant its consideration, the Appeals Council somehow determined that "this evidence does not show a reasonable probability that it would change the outcome of the decision." *Id*. As for the other evidence submitted for review, the Appeals Council determined that it did not relate to the period at issue, and thus, did not affect the ALJ's decision. *Id*.

## IV. This Action

In her Opening Brief, Dkt. No. 21, Dano makes three principal arguments. First, she asserts that the Appeals Council improperly rejected the additional evidence submitted for its review. Second, she contends that the ALJ's RFC determination was not supported by substantial evidence because Dr. Timbers' opinions were improperly rejected. Third, she asserts that the ALJ improperly rejected her own testimony.

6

# STANDARD OF REVIEW

A court must uphold an ALJ's decision "unless it is based on legal error or is not supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Id*. (quotation omitted). Stated differently, "[s]ubstantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (quotation omitted). "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Id.* at 679; *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014) ("[Courts] leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.") (citations omitted).

In addition, a court may not reverse an ALJ's decision on account of an error that is harmless. *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citation omitted). In making this assessment, the Court "look[s]

at the record as a whole to determine whether the error alters the outcome of the case." *Id*. at 1115.

## **DISCUSSION**

### I. **Additional Evidence**

In her Opening Brief, Dano argues that the Appeals Council improperly rejected evidence submitted for its review. Dkt. No. 21 at 9-13. More specifically, Dano argues that the Appeals Council's failure to "consider" the progress notes from Dr. Timbers requires remand, citing a prior decision of this Court. *Id*. at 10-12. As for the letters from Drs. Timbers and Yamaki, Dano argues that the Appeals Council improperly rejected them for not relating to the period at issue. *Id*. at 12-13. In response, the Commissioner argues that the evidence submitted to the Appeals Council does not warrant remand because the evidence does not undermine the basis for the ALJ's decision. Dkt. No. 22 at 20-24. More specifically, the Commissioner asserts that, in addition to the lack of treatment notes, the ALJ provided two other independent reasons for rejecting Dr. Timbers' opinions. *Id*. at 21-22. With respect to Dr. Yamaki's letter, the Commissioner asserts that remand is unwarranted because it is unclear as to what

time period the letter applies, and the letter is undercut by the same doctor's "benign" clinical observations. *Id*. at 22-23.[2]

The Court agrees with Dano, and disagrees with the Commissioner, for several reasons. First, as Dano points out, the undersigned has spoken on the Appeals Council's use of the same boilerplate language used in this case concerning Dr. Timbers' progress notes. Specifically, in *West v. Berryhill*, the undersigned went to some length to set forth the relevant regulations and case law concerning the Appeals Council's review of evidence submitted to it in the first instance. 2019 WL 362259, at *4-5 (D. Haw. Jan. 29, 2019). There is no need to repeat the same verbatim here beyond adhering to the discussion set forth in *West*. Further, nothing material distinguishes this case from *West*. The reason is simple: the Appeals Council continues to use misplaced boilerplate language in lieu of any analysis that allows for meaningful review. As in *West*, for instance, the Appeals Council once again stated that, although Dr. Timbers' progress notes did not show

---

[2]The Commissioner also asserts that this Court lacks jurisdiction with respect to Dano's complaints with the actions of the Appeals Council. Dkt. No. 22 at 21. As Dano argues, however, the Commissioner misses the point of Dano's underlying position. More specifically, Dano is not asking this Court to affirm or reverse the Appeals Council's denial of review. Instead, Dano is asking this Court to address whether the Appeals Council improperly rejected and/or considered the evidence she submitted for review. Dkt. No. 21 at 9-13. Undoubtedly, this Court has jurisdiction to perform that task. *See, e.g.*, *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231-32 (9th Cir. 2011). This is presumably why the Commissioner does not rest on its jurisdictional argument. *See* Dkt. No. 22 at 21-24.

a reasonable probability of changing the ALJ's decision, the Council "did not consider and exhibit this evidence." *Compare id*. at *5, *with* AR at 2. How the Appeals Council can ignore evidence, particularly evidence of the import[3] of Dr. Timbers' extensive progress notes, and simultaneously state that the same evidence would not change the ALJ's decision is difficult to comprehend. *See West*, at *5 (citing 20 C.F.R. §§ 404.970(a), (b) (2019)). *See West*, at *5-6 (citing *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1233 (9th Cir. 2011)).[4]

---

[3] That Dr. Timbers' notes were of import is not this Court's conclusion – it was the assessment of the ALJ – as discussed further below. *See, e.g.,* AR at 106, 111.

[4] Although the Court finds that this case should be remanded pursuant to *Taylor*, the Court notes that the Appeals Council's predilection for using boilerplate language that could be applied in any appeal to that body is perhaps borne from statements in cases such as *Taylor* that the Appeals Council is "'not required to make any particular evidentiary finding'" when rejecting new evidence. *Taylor*, 659 F.3d at 1232 (quoting *Gomez v. Chater*, 74 F.3d 967, 972 (9th Cir. 1996)). In other words, the lack of a need to provide "any particular evidentiary finding" appears to have been taken by the Appeals Council to mean that it need not provide any case-specific reason for making any decision. That overbroad reading has no foundation in the law of this Circuit. *Gomez* certainly does not say (or imply) that the Appeals Council can provide boilerplate language when rejecting all new evidence. First, the Ninth Circuit in *Gomez* was careful to state that its language, regarding the lack of a need to make particularized evidentiary findings, referred to "*this* evidence[.]" *Gomez*, 74 F.3d at 972 (emphasis added). In other words, evidence related to a vocational expert's report that was obtained after an adverse administrative decision. *See id*. at 971-972. It did not hold that the same approach could be used for *any and all* new evidence submitted to the Appeals Council. Second, there was a good reason why, at least in *Gomez*, the Ninth Circuit made the foregoing statement: in that case, the ALJ had determined that the claimant could perform jobs in the national economy based upon the medical-vocational guidelines. *Id*. at 972. As a result, the Appeals Council was "free to reject the evidence produced by Gomez's vocational expert…." *Id*. There was no need for the Appeals Council to give any particularized evidentiary finding in that context. Third, the court in *Gomez* affirmed the decision to deny benefits because the Commissioner carried its burden of showing that jobs existed in the national economy based upon the medical-vocational guidelines, *not* due to there being no need to give any particular evidentiary finding. Finally, in *Gomez*, the Appeals Council did make a finding. Specifically, the Appeals Council "found that the

10

Second, even if the Court was willing to assume that a harmless error analysis applies to the type of error at issue in *Taylor*, the absence of Dr. Timbers' progress notes in the record before the ALJ was harmful. The Commissioner asserts that it was not because the ALJ provided two other reasons for rejecting Dr. Timbers' opinions. The Commissioner's arguments in this regard, however, mischaracterize the record. As an initial matter, the Commissioner's suggestion, that Dr. Timbers' progress notes were "not material" to the ALJ's rejection of the doctor's opinions, Dkt. No. 22 at 12 n.4, is entirely inaccurate – the lack of progress notes was the *main* reason Dr. Timbers' opinions were rejected. This much is borne out by an objective review of the ALJ's decision. On the first occasion Dr. Timbers' opinions are addressed in the decision, the *sole* reason the ALJ gave for rejecting them was "because there are no supporting treatment notes and only Dr. Timbers' other medical source statements." AR at 106. The second

---

conclusion of Gomez's vocational expert, that Gomez could perform no work available in the national economy, was of no effect because it was based on limitations which the ALJ had properly rejected." *Id.* at 971. In other words, the Appeals Council did not simply say that the conclusion of Gomez's vocational expert "does not show a reasonable probability that it would change the outcome of the decision[,]" as is the case here with respect to Dr. Timbers' progress notes. *See* AR at 2. All of the above being said, this Court acknowledges that, since *Gomez*, the Ninth Circuit appears to have concluded that the Appeals Council need not make any particular evidentiary finding with respect to any evidence submitted for the first time to the Council. As such, in this Order, the Court does not remand because of the Appeals Council's use of boilerplate language. Instead, in addition to the independent reason discussed below, the Court remands because the Appeals Council itself states that it did not consider Dr. Timbers' progress notes.

time that Dr. Timbers' opinions are discussed, the ALJ gave *two* reasons for rejecting them: one, "[b]ecause there are no supporting treatment notes from Dr. Timbers," and, two, "also because Dr. Yamaki's extensive treatment notes as well as Dr. Yamaki's medical source statements and Dr. [Tracy] Gordy's testimony and medical source statement, all contradict Dr. Timbers' medical source statements…." *Id*. at 111. Construing the decision in as favorable a light as possible for the Commissioner, prior to stating the foregoing two reasons for rejecting Dr. Timbers' opinions, the ALJ also mentioned that Dr. Timbers' statements about Dano's daily activities, such as caring for her children and managing her finances, "indicates that [Dano's] mental functional limitations are not as significant as Dr. Timbers suggests." *Id*. To the extent that is another reason for rejecting Dr. Timbers' opinions, it does not take away from the ALJ's repeated reliance upon the lack of treatment notes as the *principal* reason the ALJ could not credit Dr. Timbers' opinions.

Further, the Court disagrees with the Commissioner's suggestion that the other reason(s) the ALJ gave for rejecting Dr. Timbers' opinions are entirely distinct from the lack of treatment notes. Put another way, the other reason(s) are interconnected with, and thus do not independently repair the harm done by, the lack of Dr. Timbers' progress notes. For example, the ALJ rejected Dr. Timbers'

12

opinions, in part, because they were contradicted by Dr. Gordy's testimony. *Id*. Dr. Gordy, in turn, was given great weight, in part, because he had the benefit of the entire record. *Id*. at 110. In light of the fact that Dr. Gordy did not have any of Dr. Timbers' progress notes, that statement is simply not accurate. Dr. Gordy was missing at least 80 pages of the record in forming her opinions. As for Dano's daily activities, the ALJ concludes the discussion in this regard by reminding that Dr. Timbers had not provided any treatment records, and thus, there were no notes to support the doctor's medical source statements. *Id*. at 111. In other words, the interconnectedness of these matters is evident from the text of the decision itself. Put another way, if the ALJ had reviewed Dr. Timbers' progress notes, the ALJ may not have concluded that Dano's daily activities undercut the doctor's opinions and/or were entirely consistent with the opinion that Dano had limitations that affected her ability to work.

In this light, remand is appropriate for the ALJ to review and assess the progress notes from Dr. Timbers that are dated July 26, 2012 through November 29, 2017.[5][6]

---

[5] So it is clear, nothing in this Order should be construed as suggesting the ALJ's review and assessment of Dr. Timbers' progress notes must lead to any particular finding and/or result on remand. Instead, the Court leaves any such determinations for the ALJ in the first instance.
[6] As for the other evidence submitted to the Appeals Council, while the record on remand may or may not be re-opened to consider the same, this Court does not find that evidence alone as

## II. RFC

The RFC provides, *inter alia*, that Dano can occasionally interact with the public and frequently interact with co-workers and supervisors. The limitation, regarding interaction with co-workers and supervisors, is based upon two pieces of evidence: (1) Dano's statement that she could get along with authority figures; and (2) Dr. Gordy's opinion that Dano had no more than a moderate limitation with respect to her ability to interact with co-workers and supervisors. AR at 110. Neither piece of evidence supports the limitation, however. Moreover, *every* doctor, other than perhaps Dr. Gordy, came to a very different opinion.

The Court begins with the evidence regarding Dano's ability to interact with co-workers and supervisors. Other than perhaps Dr. Gordy, who is discussed further below, *every* doctor who treated, examined, or did not examine Dano opined that her interaction with co-workers and supervisors should, at the very

---

warranting remand. First, the letter dated December 11, 2017 from Dr. Timbers (AR at 16) merely explains why Dr. Timbers did not submit her progress notes sooner. Although that explanation may have been relevant to whether good cause had been shown for failing to submit the progress notes, given that neither the Appeals Council nor the Commissioner in this case have relied on a lack of good cause, the Court does not find Dr. Timbers' letter relevant to any matter in dispute. Second, the letter and treatment note from Dr. Yamaki (AR 95-96, 98) are both dated January 23, 2018. While Dano asserts that the foregoing evidence pertains to a period relevant for purposes of her SSA proceeding, that is not clear from the evidence. Notably, as the Commissioner asserts, in his letter, Dr. Yamaki fails to state for what period his opinion applies–instead, he merely asserts that he has been treating Dano since August 2012. *See id*. at 98. In this light, the Court will not divine that the opinion stated in Dr. Yamaki's letter applies to any portion of the relevant period.

least, be *minimal*. AR at 647 (Dr. Timbers opining that Dano had "marked" limitations in getting along with co-workers and accepting instructions from supervisors), 615 (Dr. Yamaki opining that Dano's contact with co-workers and supervisors "would have to be minimal" in order for her to get along with them), 169, 194 (Dr. Torigoe opining that Dano could get along with co-workers and supervisors if there is minimal social contact), 222 (Dr. Lam opining that Dano would be able to relate to co-workers and supervisors if contact was minimal). In other words, *not* frequent, as the ALJ determined. In fact, the only person to have concluded that Dano could *frequently* interact with co-workers and supervisors is the ALJ.[7] The ALJ did so while also giving *great* weight apparently to all of the other opinions rendered by Dr. Yamaki, Dr. Torigoe, and Dr. Lam. *See id*. at 110-111.

The ALJ gave two reasons for this approach. First, the ALJ plucked from the record Dano's statement–in a written function report–that she got along okay with authority figures. *Id*. at 109-110, 419. The ALJ determined that this statement meant that Dano could interact with supervisors. *Id*. at 109. Why is

---

[7] In that regard, the Court notes that even the Commissioner acknowledges that Drs. Yamaki, Torigoe, and Lam opined that Dano's contact with others should be limited. Dkt. No. 22 at 7-8. The Commissioner asserts that all of these opinions "undermined" Dr. Timbers' conclusions. *Id*. at 8. If that is the case, they also "undermine[]" the ALJ's conclusions.

15

never explained, however. More important, it is never explained why this statement could transform Dano into a frequent interactor with co-workers and supervisors. This lack of explanation is particularly glaring given other statements Dano made in the function report. Notably, the function report opens with the statement that Dano has a "hard time being around people." *Id*. at 413. Dano goes on to state that she "barely" spends time with others, does not go to places on a regular basis, she does not trust anybody, and her condition has affected her ability to get along with other people. *Id*. at 417-418.

Second, the ALJ relied upon Dr. Gordy's opinion that Dano had no more than a moderate limitation in interacting with co-workers and supervisors. *Id*. at 110. The ALJ's reliance on Dr. Gordy's opinion in this regard is troubling for two distinct reasons. As an initial matter, Dr. Gordy is a non-examining doctor. Generally speaking, therefore, Dr. Gordy's opinions were entitled to the least amount of weight. *See Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) ("Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians."). Putting aside that two fellow non-examining doctors opined that Dano could have only minimal contact with co-workers or supervisors, no explanation, other than

16

perhaps the solitary statement in Dano's function report, is given as to why Dr. Gordy's opinion in this regard was entitled to more weight than, at the very least, the one of Dr. Yamaki–an examining doctor.[8]

Further, even if Dr. Gordy's opinions were on an otherwise equal footing with those of the other doctors in this case, her opinion with respect to Dano's interaction with co-workers and supervisors does not help the ALJ's determination that Dano could frequently interact with those people. Notably, the ALJ relied on Dr. Gordy's opinion that Dano had no more than a moderate limitation in interacting with co-workers and supervisors. AR at 110. The problem with relying on this limitation is that Dr. Gordy gave a similar limitation with respect to Dano's interaction with the public.[9] Specifically, Dr. Gordy gave a moderate limitation for interacting with the public, *id*. at 819, which, she testified meant that

---

[8]In particular, very little discernible attempt was made to address many of the factors that the relevant regulation directs should be considered in this regard. *See* 20 C.F.R. § 404.1527(c)(3)-(6). Instead, the ALJ appears to have fallen back on Dr. Gordy being familiar with the social security program and having the benefit of the entire record. AR at 110. Apart from the fact that, as discussed above, Dr. Gordy did not have the benefit of Dano's entire medical file, these reasons would seem to apply to *all* non-examining doctors who are asked by an ALJ to review a claimant's medical record, including Drs. Torigoe and Lam. *See id*. at 111.

[9]In fact, while Dr. Gordy gave a moderate limitation for interaction with the public, she gave a mild to moderate limitation for interaction with co-workers and supervisors. AR at 819. The ALJ, though, found that all limitations should be moderate. *Id*. at 107. This is perhaps understandable, given that, to the extent "mild" means something other than "minimal" contact, there is no evidence in the record to support Dr. Gordy's mild to moderate limitation.

Dano's interaction should be "occasional," *id*. at 144.[10]  In other words, while a moderate limitation with the public results in *occasional* interaction, a moderate limitation with co-workers and supervisors results in *frequent* interaction.  This inconsistency is entirely unexplained and, as discussed, entirely unsupported by any evidence in the record.

In this light, at least in part, the RFC is not supported by any (let alone substantial) evidence.  It is, therefore, appropriate to remand this case so that the ALJ can either provide further explanation for the RFC reached in the December 6, 2017 decision – in particular, the determination that Dano can frequently interact with co-workers and supervisors – or reassess the RFC taking into consideration the findings made herein.[11]

---

[10]Dr. Gordy also testified that Dano could "meet" with co-workers and supervisors, AR at 144, but no quantification is provided for what this means in terms of the frequency (or lack thereof) of such meetings.

[11]To the extent other issues are raised in Dano's opening brief, such as the rejection of her testimony, the Court does not address any such issues in light of the findings herein and order remanding to the ALJ.  *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) (remanding to the ALJ and, as a result, declining to reach an alternative ground for remand).  The Court observes, however, that merely because Dano can make simple meals, wash dishes, dress herself, and drive a car does not mean that she can frequently interact with others in any setting, let alone a work setting.  *Cf. Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (explaining that an "ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are *transferable to a work setting*[.]") (emphasis added, citation omitted).

## CONCLUSION

To the extent set forth herein, the Commissioner's decision, denying Dano's applications for disability insurance benefits and supplemental security income, is REVERSED. This case is REMANDED to the Commissioner for further administrative proceedings consistent with this Order. The Clerk of Court is directed to close this case.

IT IS SO ORDERED.

DATED: November 19, 2019 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

---

*Dana Ann Dano v. Andrew Saul, Commissioner of Social Security*; Civil No. 18-00434 DKW-RT; **ORDER REVERSING DECISION OF COMMISSIONER OF SOCIAL SECURITY AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS**